**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**GAINESVILLE DIVISION**

| | | |
|---|---|---|
| CHESAPEAKE EMPLOYERS' INSURANCE COMPANY, | : | |
| | : | |
| | : | |
| Plaintiff, | : | |
| | : | CIVIL ACTION NO. |
| v. | : | 2:13-CV-00209-RWS |
| | : | |
| BRUCE EADES, INSURANCE OFFICE OF AMERICA, JIM CONNER, and HORNER SERVICES, LLC, | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| Defendants. | : | |

## ORDER

This case comes before the Court on Defendant Insurance Office of America's Motion to Dismiss [28], Defendant Bruce Eades's Motion to Dismiss [29], and Defendants Jim Conner and Horner Services, LLC's Motion to Dismiss [31].  After reviewing the record, the Court enters the following Order.

### Background

Plaintiff Chesapeake Employers' Insurance Company ("Plaintiff" or "Chesapeake") brought this action over "Defendants' attempts to illegally manipulate the workers' compensation insurance system" by "creating and transmitting false certificates of insurance to Chesapeake's insured," causing

Chesapeake to forego premiums to which it was otherwise entitled.  (First Am. Compl., Dkt. [27] at 1-2.)

"Chesapeake is a not-for-profit, independent state agency that provides workers' compensation insurance coverage to Maryland businesses."  (Id. ¶ 9.) Since April 1, 2001, Chesapeake has provided workers' compensation insurance to non-party Merciers, Inc. ("Merciers"), a Maryland company that provides right-of-way maintenance and vegetation-management services.  (Id. ¶ 14.)  Merciers contracted out certain jobs to Defendant Horner Services, LLC ("Horner Services"), a Georgia company that also provides right-of-way maintenance and vegetation-management services, at different periods and locations both in and outside the state of Georgia from 2010 to 2012.  (Id. ¶ 15.) According to the July 8, 2010 contract between Merciers and Horner Services, Horner Services was required to carry its own workers' compensation insurance.  (Id. ¶ 60.)  Further, subcontractors of Horner Services were required to carry workers' compensation insurance, and Horner Services was obligated to provide Merciers with copies of both their insurance and their subcontractors' insurance.  (Id. ¶¶ 60-61.)

On July 5, 2011, Chesapeake conducted a routine audit of Merciers to

2

calculate the premiums Merciers owed.  (Id. ¶ 19.)  Sometime before that date,

Defendant Insurance Office of America, Inc. ("IOA"), IOA employee

Defendant Bruce Eades, Horner Services, and Horner Services' owner

Defendant Jim Conner provided Merciers a certificate of insurance dated

October 22, 2010 ("October 2010 Certificate").  (Id. ¶ 17.)  That certificate

names Horner Services as the insured, lists Conner as the primary contact, and

states that Horner Services had workers' compensation insurance through

Columbia Insurance Group for the period of June 17, 2010, through June 17,

2011.  (Id.)  The October 2010 Certificate also contains a section titled

"Description of Operation/Locations/Vehicles," which states: "RE: Contract #

47105—Job Site: Union Pacific Railroad Company Property—CA."  (Id.;

October 2010 Certificate, Dkt. [27-1] at 2.)  IOA is listed as the "Producer" of

the certificate and Eades is listed as the "authorized representative."  (Id.)

      Defendants provided another certificate of insurance to Merciers dated

June 20, 2011 ("June 2011 Certificate"), which again lists Horner Services as

the insured and Conner as the primary contact.  (Id. ¶ 18.)  It states that Horner

Services had workers' compensation insurance from June 17, 2011, through

June 17, 2012 from Georgia Casualty & Surety Co.  (Id.)  The June 2011

3

Certificate contains the same job-site description and lists IOA as the "Producer" and Eades as the "authorized representative."  (Id.)

During the July 5, 2011 audit, Chesapeake relied on the October 2010 and June 2011 Certificates to calculate Merciers workers' compensation premium.  (Id. ¶ 19.)  Believing Horner Services had its own workers' compensation insurance, Chesapeake charged premiums to Merciers without taking into account the Horner Services payroll.  (Id.)

Around December 18, 2012, Chesapeake learned that Merciers was withholding payment from Horner Services until it provided proof of insurance. Conner then provided Merciers five certificates of insurance, each showing that Horner Services had workers' compensation coverage in states other than Georgia.  (See id. ¶¶ 20-25.)

Chesapeake later learned that Horner Services did not in fact have workers' compensation coverage outside the state of Georgia.  Over two years earlier, a Horner Services employee or subcontractor named William Sheldon suffered a workplace injury in Missouri and submitted a workers' compensation claim.  (Id. ¶ 27.)  This claim was denied after the insurance company determined that Horner Services was only insured for workers' compensation

4

claims arising in Georgia.  (Id. ¶ 30.)  Chesapeake learned about this denial on

December 20, 2012.  (Id.)  Merciers was consequently the statutory employer

for Horner Services and its employees and subcontractors operating outside of

Georgia, and Chesapeake—as Merciers' insurer—became obligated to defend

this claim through its Missouri subsidiary.  (Id. ¶ 32.)

Chesapeake later learned that Sheldon had relied on a certificate of

insurance issued to Horner Services dated December 18, 2012 ("December

2012 Certificate"), which Eades signed and which referenced coverage in

Arkansas, Kansas, Louisiana, Texas, Missouri, Oklahoma, Illinois, and

California.  (Id. ¶ 33; December 2012 Certificate, Dkt. [27-1] at 17.)  But since

Horner Services was not actually insured in these states, Chesapeake decided to

investigate Horner Services' other certificates of insurance.  (First Am. Compl.,

Dkt. [27] ¶ 33.)  As a result of its investigation, Chesapeake determined that

Defendants provided numerous false certificates to Merciers upon which

Chesapeake relied in calculating Merciers' insurance premiums.  (Id. ¶ 34.)

Chesapeake's investigators contacted Defendants Eades, Conner, and

IOA about the discrepancies.  IOA then sent letters to Merciers and to

Chesapeake stating that the December 2012 Certificates "should be completely

5

disregarded." (Id. ¶ 35.)  While IOA attached these voided certificates to the letter, it did not attach the October 2010 and June 2011 Certificates.  (Id.)

Chesapeake alleges that it was damaged because it calculated its premiums during the policy periods of April 1, 2010–April 1, 2011, and April 1, 2011–April 1, 2012, based on the representation that Horner Services was insured in states other than Georgia.  (Id. ¶ 36.)  Thus, Chesapeake did not charge Merciers based on Merciers' $8.1 million payroll to Horner Services during these periods.  (Id. ¶ 38.)  During that time, Chesapeake collected $319,259 in workers' compensation premiums from Merciers, but if it had known that Horner Services did not have its own workers' compensation insurance, Chesapeake would have charged Merciers $1,314,104 in premiums "to account for the $8,086,014 in additional payroll exposure."  (Id. ¶ 39.)

Based on the above allegations, Chesapeake alleges numerous claims against Defendants IOA, Eades, Horner Services, and Conner, including negligent misrepresentation, tortious interference with contractual relations, fraud, and violations of the Georgia and Federal Racketeer Influenced and Corrupt Organizations Act ("RICO").  Defendants move for dismissal of all claims.

AO 72A
(Rev.8/82)

## Discussion

### I.      Motion to Dismiss Legal Standard

Federal Rule of Civil Procedure 8(a)(2) requires that a pleading contain a "short and plain statement of the claim showing that the pleader is entitled to relief."  While this pleading standard does not require "detailed factual allegations," mere labels and conclusions or "a formulaic recitation of the elements of a cause of action will not do."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)).  In order to withstand a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Id. (quoting Twombly, 550 U.S. at 570).  A complaint is plausible on its face when the plaintiff pleads factual content necessary for the court to draw the reasonable inference that the defendant is liable for the conduct alleged.  Id.

"At the motion to dismiss stage, all well-pleaded facts are accepted as true, and the reasonable inferences therefrom are construed in the light most favorable to the plaintiff."  Bryant v. Avado Brands, Inc., 187 F.3d 1271, 1273 n.1 (11th Cir. 1999).  However, the same does not apply to legal conclusions set forth in the complaint.  See Iqbal, 556 U.S. at 678.  "Threadbare recitals of the

7

elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. Furthermore, the court does not "accept as true a legal conclusion couched as a factual allegation." Twombly, 550 U.S. at 555.

## II.    Failure to Join an Indispensable Party

Defendants argue that this suit is subject to dismissal under Federal Rule of Civil Procedure 19 for failure to join an indispensable party. (See Conner & Horner's Br., Dkt. [31-1] at 5-7.) Defendants assert that Merciers is indispensable because Plaintiff's contract was with Merciers, not Defendants, and thus Plaintiff's insurance claim for lost premiums should be brought against Merciers. Rule 19 sets forth a two-part analysis. Laker Airways, Inc. v. British Airways, PLC, 182 F.3d 843, 847 (11th Cir. 1999). The Court must first determine whether a person should be joined. Id.; see FED. R. CIV. P. 19(a). If the person should be joined but cannot be joined, the Court must consider whether the action can continue without the presence of that person. See FED. R. CIV. P. 19(b). If not, the person is considered indispensable. Laker Airways, 182 F.3d at 847.

In deciding whether a person should be joined, the Court will consider if:

(A) in that person's absence, the court cannot accord complete

relief among existing parties; or

(B) that person claims an interest relating to the subject of the action and is so situated that disposition of the action in the person's absence may:

(i) as a practical matter impair or impede the person's ability to protect the interest; or

(ii) leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest.

FED. R. CIV. P. 19(a)(1).  Thus, a person is considered "necessary" to the action if either complete relief cannot be obtained without that person or that person has an interest in the disposition of the proceedings.  Laker Airways, 182 F.3d at 847.

Merciers is not a necessary party to this action under Rule 19(a)(1)(A) "because the district court could provide 'complete relief' among the litigants without joining [Merciers]."  See Winn-Dixie Stores, Inc. v. Dolgencorp, LLC, 746 F.3d 1008, 1039 (11th Cir. 2014) (holding that a defendant "was fully able to pay damages and comply with injunctions" without joining landlords in a suit by competitor to enforce restrictive covenants).  Plaintiff alleges that Defendants, not Merciers, committed wrongdoing, and that they directed their

acts at Plaintiff.  If liable, Defendants could pay damages without Merciers.

Nor does Merciers have interests at stake that could be harmed in the course of the litigation as contemplated under Rule 19(a)(1)(B).  Although Defendants contend that Merciers must be joined because it "is allegedly directly liable to Plaintiff for breach of contract," (Conner & Horner's Reply, Dkt. [39] at 3), "the resolution of a separate contract dispute between [Plaintiff] and [Merciers] in no way conflicts with" Plaintiff's RICO and tort claims against Defendants.  See Winn-Dixie Stores, 746 F.3d at 1040 (" 'Inconsistent obligations' are not . . . the same as inconsistent adjudications or results." (quoting Delgado v. Plaza Las Ams., Inc., 139 F.3d 1, 3 (1st Cir. 1998))).  Consequently, Merciers is not a necessary party.[1]

## III.    Federal RICO Claims

Plaintiff alleges that Defendants committed multiple acts of mail or wire fraud in a scheme to defraud Chesapeake.  Plaintiff brings two separate claims for violations of 18 U.S.C. § 1962(c): one against Conner and Horner, and one

---

[1]Even if Merciers were joined as a defendant and destroyed diversity, it would not deprive the Court of jurisdiction because, as explained in Part III, *infra*, Plaintiff states a claim under Federal RICO, providing a basis for the Court's federal question jurisdiction.

against Eades and IOA.  Section 1962(c) makes it

> unlawful for any person employed by or associated with any
> enterprise engaged in, or the activities of which affect, interstate or
> foreign commerce, to conduct or participate, directly or indirectly,
> in the conduct of such enterprise's affairs through a pattern of
> racketeering activity or collection of unlawful debt.

18 U.S.C. § 1962(c).  Accordingly, "[t]o state a RICO claim, a plaintiff

must plead (1) that the defendant (2) through the commission of two or

more acts (3) constituting a 'pattern' (4) of 'racketeering activity' (5)

directly or indirectly invests in, or maintains an interest in, or participates

in (6) an 'enterprise' (7) the activities of which affect interstate

commerce." McCulloch v. PNC Bank, Inc., 298 F.3d 1217, 1225 (11th

Cir. 2002).  Plaintiff also alleges a claim for RICO conspiracy under §

1962(d) against all Defendants.

 Defendants argue that Chesapeake's RICO claims fail for several

reasons: Plaintiff fails to allege damages recoverable under RICO; Plaintiff

cannot establish proximate causation; Plaintiff has failed to plead an enterprise

distinct from a RICO defendant with respect to Horner Services and IOA; and

Plaintiff has failed to plead a "pattern of racketeering activity."  The Court

examines these arguments as to each Defendant below.

11

A.     Whether Plaintiff's Damages Are Recoverable under RICO

Defendants first argue that Chesapeake's "lost premiums" are unrecoverable under RICO because those damages are not concrete or quantifiable, as the RICO statute requires.  See Ironworkers Local Union 68 v. AstraZeneca Pharm., LP, 634 F.3d 1352, 1361 (11th Cir. 2011) ("A plaintiff asserting a claim under § 1964(c) of RICO must allege economic injury arising from the defendant's actions.").  Thus, a plaintiff under § 1964(c) "only has standing if, and can only recover to the extent that, he has been injured in his business or property by the conduct constituting the [RICO] violation." Sedima, S.P.R.L. v. Imrex Co., Inc., 473 U.S. 479, 496 (1985).

Defendants note that "[a]lthough the Supreme Court has demanded that 'RICO is to be read broadly,' the injury to business or property limitation on RICO standing has a 'restrictive significance.' "  Ironworkers Local Union 68, 634 F.3d at 1361 (citation omitted) (quoting Reiter v. Sonotone Corp., 442 U.S. 330, 339 (1979)).  In this regard, the limitation "helps to assure that RICO is not expanded to provide a federal cause of action and treble damages to every tort plaintiff."  Id. (quoting Steele v. Hosp. Corp. of Am., 36 F.3d 69, 70 (9th Cir. 1994)) (internal quotation marks omitted).

12

Defendants characterize Plaintiff's damages as "expectancy-type, benefit of the bargain damages," which they say courts have not allowed under RICO. (See IOA's Br., Dkt. [28-1] at 8.)  One case Defendants cite for this proposition is Simpson v. Sanderson Farms, Inc., 744 F.3d 702 (11th Cir. 2014), in which the Eleventh Circuit held that the plaintiffs failed to plausibly allege injury in support of their RICO claim.  In that case, the plaintiffs alleged that the defendant poultry processing plant illegally hired over 300 unskilled workers, which in turn depressed wages the farm paid to work-authorized unskilled employees.  Id. at 707.  The court noted that the plaintiffs might have been able to plead a RICO claim based on the defendant's conduct and resulting depressed wages, but the court found that the plaintiffs "pled injury at only the highest order of abstraction and with only conclusory assertions."  Id. at 709.  In fact, the plaintiffs "offered no market data that might permit [the court] plausibly to infer a gap between the wages they *actually* received at [the plant] and the wages they *would have* received but for the alleged . . . misconduct."  Id.  The court went on to explain that direct evidence of lost profits, such as estimated wages paid by a comparable poultry processing plant hiring only legal workers in the relevant market, could have helped the plaintiffs' case.  See

13

id.  Instead, without any empirical data, the plaintiffs relied "on a vague market theory."  Id. at 710.  In sum, the plaintiffs' theory that hiring illegal workers depressed wages was "unsupported by any concrete facts or data."  Id.

Unlike in Simpson, here Chesapeake alleges facts to support its contention that it would have charged more in premiums absent Defendants' fraud.  Plaintiff specifically alleges: "Had Chesapeake known that Horner did not have workers' compensation insurance, it would have charged it $1,314,104 in workers' compensation premiums, to account for the $8,086,014 in additional payroll exposure.  Accordingly, the total amount of Chesapeake's lost premiums equals approximately $994,845."  (First Am. Compl., Dkt. [27] ¶ 39.)[2]

Nevertheless, Defendants stress that these damages are like "benefit of the bargain" damages, which are not recoverable under RICO.  In another case Defendants cite, Roberts v. The Scott Fetzer Co., No. 4:07-CV-80 (CDL), 2010 WL 3937312 (M.D. Ga. Sept. 30, 2012), a plaintiff in a putative class action sought damages for the defendant's misrepresentation that previously-owned

---

[2]Plaintiff clarifies in its Response to IOA's Motion to Dismiss that it does not seek to recover the $7,000 in litigation expenses related to the Sheldon claim in this action.  (Pl.'s Resp., Dkt. [33] at 8 n.3.)

vacuum cleaners were new.  There, the plaintiff did not seek damages based on the difference in the value of the product in its represented condition and the value of the product in its actual condition; rather, the plaintiff took "a 'benefit of the bargain' approach based on consumers' expectations and argue[d] that each Plaintiff suffered the same degree of damage simply by purchasing a cleaning system they thought was new but was actually previously-owned."  <u>Id.</u> The court rejected this theory of damages because "intangible, expectancy-type, benefit of the bargain damages . . . are not what are contemplated as being recoverable as RICO damages."  <u>Id.</u> at *10 (collecting cases).  The court reasoned that a party's expectation cannot constitute "business or property" under RICO.  <u>Id.</u>  Here, Defendants argue that Plaintiff's damages (premiums it could have charged but did not) are likewise not cognizable.

Plaintiff responds that Defendants' characterization of its injury is misleading.  (<u>See</u> Pl.'s Br., Dkt. [33] at 8.)  Plaintiff emphasizes that it contracted with Merciers to provide workers' compensation insurance in exchange for a premium.  (<u>Id.</u>)  And, while the amount of the premium depends on a number of factors, paying the premium is a contractual obligation, and the premium is higher if Plaintiff is required to provide increased coverage because

the insured's subcontractors do not have their own workers' compensation insurance.  (Id.)  Unlike the plaintiff in Roberts, Plaintiff here does not assert an intangible property interest.  It instead alleges a concrete financial loss in premiums it was entitled to under the insurance contract.

Defendants next cite a case from the Second Circuit Court of Appeals in arguing that an "additional risk of loss" is not recoverable under RICO.  (IOA's Br., Dkt. [28-1] at 9.)  In First Nationwide Bank v. Gelt Funding Corp., 27 F.3d 763 (2d Cir. 1994), a bank accused a borrower of fraudulently misrepresenting the value of collateral in obtaining a loan.  Id. at 765.  The bank claimed that it had standing to sue under RICO, even though it had not yet incurred any actual loss, because "it suffered immediate quantifiable injury when the loans were made because the loans were undersecured" and thus the bank "assumed additional risk of loss."  Id. at 768.  The Second Circuit held that the bank "d[id] not suffer actual injury by simply claiming that it incurred additional risk of loss as a consequence of the fraud."  Id.  The court emphasized that, "with respect to those loans not yet foreclosed, the actual damages [the bank] will suffer, if any, are yet to be determined."  Id.

Once again, though, Plaintiff's damages are not so vague.  Plaintiff's

16

claim is for premiums it was entitled to, but due to Defendants' alleged fraud, Plaintiff did not charge and collect.  So, while Plaintiff logically incurred additional risk of loss considering its insured was the statutory employer for more subcontractors than it originally believed, Plaintiff does not allege damages for this intangible factor; it seeks compensation only for premiums it would have charged under the insurance contract had it known Horner Services was not insured outside of Georgia.  Plaintiff even alleges the specific sum it is owed.  Based on these allegations, Plaintiff plausibly pleads damages recoverable under RICO.

> B.      Proximate Causation

Defendants next argue that Plaintiff cannot establish proximate causation. "[T]o state a claim under civil RICO, the plaintiff is required to show that a RICO predicate offense 'not only was a "but for" cause of his injury, but was the proximate cause as well.' " Hemi Grp., LLC v. City of New York, 559 U.S. 1, 9 (2010) (quoting Holmes v. Sec. Investor Prot. Corp., 503 U.S. 258, 268 (1992)).  The Supreme Court has explained that "[a] link that is 'too remote,' 'purely contingent,' or 'indirec[t]' is insufficient." Id. (quoting Holmes, 503 U.S. at 271).  "When a court evaluates a RICO claim for proximate causation,

17

the central question it must ask is whether the alleged violation led directly to the plaintiff's injuries." <u>Anza v. Ideal Steel Supply Corp.</u>, 547 U.S. 451, 461 (2006).

Defendants IOA and Eades contend that "Chesapeake, if it was injured at all by the alleged acts of mail and wire fraud, was injured too remotely to satisfy RICO's proximate cause requirements for standing." (IOA's Br., Dkt. [28-1] at 14-15.)  Because IOA and Eades did not send the certificates to Chesapeake, Defendants state that Chesapeake was not the victim or target of mail fraud.  Further, Defendants argue that holding them liable for an indirect injury would risk multiple recoveries and complicate apportionment of damages.

Plaintiff alleges, however, that "Defendants intended to induce Chesapeake to refrain from charging Merciers premiums on work performed for it by Horner Services, knowing that Merciers was unlikely to hire Horner Services if it knew that Horner Services did not have workers' compensation insurance in the states where it was performing work, and that its insurance premiums would be higher if it hired an uninsured contractor." (First Am. Compl., Dkt. [27] ¶ 59.)  Plaintiff then relied on the certificates of insurance

18

"because they appeared to be valid."  (<u>Id.</u> ¶ 63.)  Therefore, Plaintiff pleads both

that it was the target of Defendants' fraud and that it relied on the certificates in

deciding to charge Merciers insufficient premiums.  Under Plaintiff's theory,

Chesapeake's damages were not far removed from the causal chain, diminishing

Defendants' concern over multiple recoveries or apportionment of damages.  As

a result, Plaintiff adequately pleads a direct link between Defendants' conduct

and Plaintiff's injury, thereby sufficiently pleading proximate causation.

      <u>C.</u>     <u>Whether Plaintiff Has Pled an Enterprise Distinct from a RICO</u>
            <u>Defendant</u>

     Defendants IOA and Horner Services each argue that they should be

dismissed for the additional reason that they are both RICO enterprises and

RICO defendants, and so their inclusion as Defendants violates RICO's "non-

identity rule."  Because 18 U.S.C. § 1962(c) limits RICO liability to "person[s]

employed by or associated with any enterprise," 18 U.S.C. § 1962(c), "[t]he

'person' subject to liability must be distinct from the 'enterprise' whose affairs

are conducted through a pattern of racketeering activity."  <u>Burchett v. Lagi</u>, No.

1:11-CV-2379-TWT, 2012 WL 3042984, at *2 (N.D. Ga. July 25, 2012); <u>see</u>

<u>also</u> <u>Cedric Kushner Promotions, Ltd. v. King</u>, 533 U.S. 158, 162 (2001)

19

(holding that a RICO plaintiff "must allege and prove the existence of two distinct entities: (1) a 'person'; and (2) an 'enterprise' that is not simply the same 'person' referred to by a different name").  "The distinction between the RICO person and the RICO enterprise is necessary because the enterprise itself can be a passive instrument or victim of the racketeering activity." U.S. v. Goldin Indus., Inc., 219 F.3d 1268, 1270 (11th Cir. 2000).  Thus, RICO "liability depends on showing that the defendants conducted or participated in the conduct of the '*enterprise's* affairs,' not just their own affairs." Reves v. Ernst & Young, 507 U.S. 170, 185 (1993).

Plaintiff insists that each Defendant is distinct from the enterprise. Plaintiff claims that it has alleged an association-in-fact between IOA and Eades, and that together they form one enterprise.  (See Pl.'s Resp., Dkt. [33] at 13.)  Plaintiff similarly argues that there was an association-in-fact between Conner and Horner Services, who form the other enterprise.  (See Pl.'s Resp., Dkt. [35] at 12.)  As such, Plaintiff asserts that IOA and Horner Services are persons within the meaning of RICO.  Additionally, Plaintiff argues that IOA and Horner Services are vicariously liable for Eades and Conner's actions.

Despite arguing that it has alleged associations-in-fact between IOA and

20

Eades and between Horner Services and Conner, Plaintiff expressly alleges in

its First Amended Complaint that Conner is a person and Horner Services is the

enterprise.  (First Am. Compl., Dkt. [27] ¶¶ 111-12.)  Similarly, Plaintiff alleges

that Eades is a person and IOA is the enterprise.  (Id. ¶¶ 129-30.)

Plaintiff further alleges that Conner is associated with and participates in

the "Horner Services Enterprise" and "agreed to, and knowingly, intentionally,

and willfully participated in the conduct of the Horner Services Enterprise's

affairs through a pattern of racketeering activity."  (Id. ¶¶ 113-15.)  As for

Eades, Plaintiff states that he engaged in the same sort of activity with the "IOA

Enterprise."  (Id. ¶¶ 131-33.)  Thus, instead of pleading that the individuals and

corporate entities together formed an enterprise in which they were each

participants, Plaintiff plainly pleads that the corporations themselves were

enterprises in which Eades and Conner participated.  The First Amended

Complaint thus undercuts Plaintiff's argument.  While courts have recognized

that a corporation can be liable under RICO when there is an association-in-fact

between an individual and a corporation, see, e.g., Coquina Invs. v. Rothstein,

No. 10-60786-Civ., 2011 WL 4971923, at *8 (S.D. Fla. Oct. 19, 2011) (holding

that a bank did not make up an entire enterprise because the plaintiff alleged an

21

association-in-fact between an individual and a bank), here Plaintiff fails to

allege that either IOA or Horner Services "associates with others to form an

enterprise that is sufficiently distinct from itself," see <u>Riverwoods Chappaqua</u>

<u>Corp. v. Marine Midland Bank</u>, 30 F.3d 339, 344 (2d Cir. 1994) ("[W]here

employees of a corporation associate together to commit a pattern of predicate

acts in the course of their employment and on behalf of the corporation, the

employees in association with the corporation do not form an enterprise distinct

from the corporation.").  It follows that Plaintiff's RICO claims against

Defendants IOA and Horner Services must be dismissed because, as RICO

enterprises, they cannot also be defendants under the RICO Act.[3]

> **D.**    Whether Plaintiff Has Pled a "Pattern of Racketeering"

Defendants further assert that Plaintiff has failed to allege closed-ended

or open-ended continuity, which is required to show a pattern of racketeering

under Federal RICO.  "Essential to any successful RICO claim are the basic

---

[3]"Most circuits have held that vicarious liability is inappropriate where the corporate defendant is the RICO enterprise because imposing liability in such circumstances would violate the non-identity rule . . . ." <u>Coquina Invs.</u>, 2011 WL 4971923, at *8.  Because imposing vicarious liability on IOA and Horner Services would violate the non-identity rule, IOA and Horner Services cannot be liable on this basis, either.

22

requirements of establishing a RICO enterprise and a 'pattern of racketeering activity.' " Jackson v. BellSouth Telecomm., 372 F.3d 1250, 1264 (11th Cir. 2004).  "To successfully allege a pattern of racketeering activity, plaintiffs must charge that: (1) the defendants committed two or more predicate acts within a ten-year time span; (2) the predicate acts were related to one another; and (3) the predicate acts demonstrated criminal conduct of a *continuing* nature." Id. (emphasis in original).  "RICO's legislative history reveals Congress' intent that to prove a pattern of racketeering activity a plaintiff . . . must show that the racketeering predicates are related, *and* they amount to or pose a threat of *continued criminal activity*." Id. at 1265 (quoting H.J. Inc. v. Nw. Bell Tel. Co., 492 U.S. 229, 239 (1989)) (emphasis in original).  "The continuity element . . . is crucial to a valid RICO claim in order to ensure that the crime alleged is the sort of offense that RICO is designed to address—one that is part of a pattern of ongoing, continuing criminality or that involves criminality that promises to continue into the future." Id.

There are two ways to allege continuity of racketeering activity: closed-ended and open-ended continuity.  "A party alleging a RICO violation may demonstrate continuity over a closed period by proving a series of related

23

predicates extending over a substantial period of time." Id. at 241-42.  Or, to

show open-ended continuity, a plaintiff may allege "past conduct that by its

nature projects into the future with a threat of repetition." Id.  In open-ended

cases, "liability depends on whether the *threat* of continuity is demonstrated."

Id.

First, for purposes of establishing closed-ended continuity, there is no

bright-line rule regarding what constitutes a "substantial period of time."

Jackson, 372 F.3d at 1266.  However, according to the Eleventh Circuit, "the

great weight of authority suggests that nine months is a wholly insufficient

interlude." Id.  Indeed, other circuits have agreed with this circuit that closed-

ended continuity cannot be established with allegations spanning less than a

year. Id.  And the period may have to be even longer where the RICO

allegations "concern only a single scheme with a discrete goal," like the present

case. Id.  Here, the alleged scheme had a discrete goal: "induce Chesapeake to

refrain from charging Merciers premiums on work performed for it by Horner

Services" since Merciers would be less likely to hire Horner Services if it knew

Horner was uninsured.  (First Am. Compl., Dkt. [27] ¶ 59.)  Plaintiff alleges

that Chesapeake relied on these certificates and charged Merciers less in

premiums than it otherwise would have.  As a result, Defendants accomplished their scheme.

The parties dispute how to measure the duration of the scheme. Defendants insist that the relevant period is about 18 months, measured from July 5, 2011 (the date Chesapeake conducted the audit and first obtained the certificates), until December 18, 2012 (the date IOA and Eades issued a certificate referencing coverage in Arkansas, Kansas, Louisiana, Texas, Missouri, Oklahoma, Illinois, and California).  (See Conner & Horner's Br., Dkt. [31-1] at 10.)  Plaintiff, on the other hand, argues that the scheme started on October 22, 2010, the date IOA and Eades issued the first certificate.  Thus, if IOA did transmit the certificate on that date, then the pattern of racketeering extended for two years and two months.  (See Pl.'s Resp., Dkt. [35] at 13.) Construing the allegations in favor of Plaintiff, the Court agrees that the alleged pattern of racketeering took place over two years and two months, as that time period includes the days Defendants issued the false certificates.

Still, Defendants argue that a period of over two years is insufficient to establish closed-ended continuity for a single scheme with a discrete goal.  The Eleventh Circuit has indicated that several factors can determine whether a

25

given period of time is "substantial" for continuity purposes, such as the complexity and size of the scheme, number of victims, and number of predicate acts.  See, e.g., Jackson, 372 F.3d at 1267 (collecting cases).  In that regard, the Eleventh Circuit has held that a complaint failed to allege closed-ended continuity "[g]iven the scant allegations, the limited time frame [of less than two years], the single scheme and existence of only two victims."  Ferrell v. Durbin, 311 F. App'x 253, 257 (11th Cir. 2009).  In another case, a district court in the Eleventh Circuit found that plaintiffs adequately pled continuity related to a scheme lasting only eighteen months when the scheme "involved at least eighteen distinct victims, involved several predicate acts including mail fraud, wire fraud, immigration document fraud, and human trafficking and forced labor, and spanned at least two states and two countries."  Magnifico v. Villanueva, 783 F. Supp. 25 1217, 1229 (S.D. Fla. 2011).  Yet a court has also found that "several acts of mail and wire fraud between the same parties over at least a two year period" constitute a "substantial period of time."  See Colonial Penn Ins. Co. v. Value Rent-A-Car Inc., 814 F. Supp. 1084, 1094 (S.D. Fla. 1992).  In view of these cases, the Court finds that Plaintiff's allegations that Defendants committed multiple acts of mail and wire fraud over two years and

two months against Merciers and Chesapeake is adequate to survive a motion to dismiss.

Turning to open-ended continuity, however, the Court finds that there is no ongoing threat of future fraud. To establish open-ended continuity, a plaintiff must show either that "the racketeering acts themselves include a specific threat of repetition extending indefinitely into the future," or that "the predicate acts or offenses are part of an ongoing entity's regular way of doing business." H.J. Inc., 492 U.S. at 242. Here there is no specific threat of repetition in the future, as IOA repudiated the certificates Eades issued on its behalf. Further, Defendants accomplished their goal of inducing Chesapeake to rely on the certificates so Merciers would hire Horner Services, believing it was insured outside of Georgia. There is thus no alleged or logical danger of future fraud based on this scheme. See Ferrell v. Durbin, 311 F. App'x 253, 257 (11th Cir. 2009) ("[I]t is clear that single schemes with a specific objective and a natural ending point can almost never present a threat of continuing racketeering activity.").

Also, while Plaintiff alleges that Defendants' acts are part of their ongoing way of doing business, (First Am. Compl., Dkt. [27] ¶¶ 123, 141),

Plaintiff does not allege facts showing that Defendants conducted similar schemes against other businesses.  Without more, Plaintiff fails to establish open-ended continuity.  Having sufficiently alleged closed-ended continuity, however, Plaintiff may proceed on its RICO claims with respect to Defendants Eades and Conner.[4]

## IV.  Georgia RICO Claims

"Georgia's RICO act, while it has similarities to the federal RICO statute, has a number of significant differences."  <u>Dover v. Barnes</u>, 385 S.E.2d 417, 419 (Ga. Ct. App. 1989).  Notably, unlike the federal RICO statute, Georgia does not require a showing of continuity to demonstrate a "pattern of racketeering."  <u>Id.</u> at 421 ("[O]ur legislature intended to and did, by virtue of §§ 16-14-4(a) and 16-14-3(2), subject to the coverage of our RICO statute two crimes, included in the statute as designated predicate acts, which are part of the same scheme, without the added burden of showing that defendant would continue the conduct or had been guilty of like conduct before the incident charged as a RICO violation.").

---

[4]Defendants argue for dismissal of Plaintiff's RICO conspiracy claim in the event no substantive RICO claims survive.  Given that Plaintiff's substantive RICO claims survive the motion to dismiss, the RICO conspiracy claim also remains.

Defendants raise two arguments in favor of dismissal of the Georgia

RICO claims.  First, Defendants contend that Plaintiff fails to establish

proximate causation.  For the reasons discussed in *supra* Part III.B., however,

this argument fails because Plaintiff pleads facts from which a jury could find

proximate causation.  Defendants' second argument is that Plaintiff has failed to

allege two viable acts of racketeering, as Defendant insists the two certificates

upon which Plaintiff claims it relied in its July 2011 audit contained no false

information.  (<u>See</u> Eades's Br., Dkt. [29-1] at 10.)  Thus, Defendant states that

Plaintiff relies on only one predicate act: the issuance of the December 2012

Certificate.  Plaintiff alleges that the two certificates it relied on in the July 2011

audit contained sections titled "Description of Operation/Locations/Vehicles,"

which state: "RE: Contract # 47105—Job Site: Union Pacific Railroad

Company Property—CA."  (October 2010 Certificate, Dkt. [27-1] at 2; June

2011 Certificate, Dkt. [27-1] at 5.)  Defendants argue that these certificates do

not contain any representation about the scope of Horner Service's workers'

compensation insurance coverage.  (Eades's Br., Dkt. [29-1] at 20.)  Defendants

further explain that there is no representation about coverage in multiple states

or the coverage of subcontractors.  (<u>Id</u>.)  The Court finds Defendants' argument

unpersuasive.  Construing the certificates in favor of Plaintiff, the certificates

appear to reference insurance coverage related to a job site in California.

Because Horner Services was not insured in California, Plaintiff alleges facts

sufficient to show that issuing the October 2010 and June 2011 Certificates

were predicate acts.  Consequently, Defendant Conner and Eades' motions to

dismiss the Georgia RICO claims are **DENIED**.  However, for the reasons

stated in *supra* Part III.C., Defendants IOA and Horner Services' motions to

dismiss are **GRANTED** because they are RICO enterprises and cannot also be

RICO defendants.

## V.    Negligent Misrepresentation

"The essential elements of negligent misrepresentation are '(1) the

defendant's negligent supply of false information to foreseeable persons, known

or unknown; (2) such persons' reasonable reliance upon that false information;

and (3) economic injury proximately resulting from such reliance.'"  Marquis

Towers, Inc. v. Highland Grp., 593 S.E.2d 903, 906 (Ga. Ct. App. 2004)

(quoting Hardaway Co. v. Parsons, Brinckerhoff, Quade & Douglas, Inc., 479

S.E.2d 727, 729 (Ga. 1997)).

Defendants IOA and Eades attack Plaintiff's negligent misrepresentation

30

claim by arguing that (1) Chesapeake was not a foreseeable recipient of the certificates; (2) Chesapeake unreasonably relied on the certificates in light of the disclaimers on the documents; and (3) Chesapeake has not pled a recoverable injury resulting from its reliance because Georgia law only allows the recovery of out-of-pocket losses for a negligent misrepresentation claim. (See Eades's Br., Dkt. [29-1] at 11-13.)  Defendants Conner and Horner Services make the same arguments while adding that they did not provide the certificates to Chesapeake.  (See Conner & Horner's Br., Dkt. [31-1] at 17.)

First, IOA and Eades assert that Chesapeake was not a foreseeable recipient of the certificates because there was no privity of contract between IOA, Eades, and Chesapeake, and IOA did not intend to send the certificates to Chesapeake.  (Id. at 11-12.)  Plaintiff does allege, however, that "[a]s a licensed insurance broker, Eades knew that, by issuing certificates showing coverage where there was none, he was obligating Merciers' insurer, Chesapeake, to provide workers' compensation coverage to Horner Services employees and uninsured subcontractors outside of Georgia."  (First Am. Compl., Dkt. [27] ¶ 37.)  Moreover, Plaintiff alleges that "Defendants intended to induce Chesapeake to refrain from charging Merciers premiums . . . , and that its

31

insurance premiums would be higher if it hired an uninsured contractor." (Id. ¶ 59.)  The Court finds that Plaintiff plausibly alleges Defendants knew Chesapeake would receive the certificates and that Chesapeake would rely on the certificates in calculating Merciers' insurance premiums.  See Badische Corp. v. Caylor, 356 S.E.2d 198, 200 (Ga. 1987) ("If it can be shown that the representation was made for the purpose of inducing third parties to rely and act upon the reliance, then liability to the third party can attach.  If such cannot be shown there will be no liability in the absence of privity, willfulness or physical harm or property damage." (quoting Robert & Co. v. Rhodes-Haverty P'ship, 300 S.E.2d 503, 504 (Ga. 1983))).

Defendants next contend that the disclaimers on the documents made it unreasonable for anyone to rely on the information they contained.  Each certificate notes that it "is issued as a matter of information only and confers no rights upon the certificate holder."  (October 2010 Certificate, Dkt. [27-1] at 2.) Thus, Defendants state it was unreasonable to rely solely on the certificates in calculating Merciers' policy premiums.  Plaintiff responds that it was entitled to rely on the information as represented, even though the certificate said it "does not constitute a contract between the issuing insurer(s) . . . and the certificate

32

holder." (Id.)  The Court agrees.  The language of the disclaimer indicates that the certificate should not be relied on as a written contract.  But, Plaintiff plausibly pleads that it reasonably relied on the certificate to the extent that it showed Horner Services carried workers' compensation insurance in California. Relying on the document in this manner would be consistent with the disclaimer that it is "a matter of information only."  While Plaintiff could not have relied on the certificate for the precise terms of insurance or the amount of coverage remaining, it would be reasonable to rely on the certificate for the fact that Horner Services carried workers' compensation insurance.  Therefore, Plaintiff adequately pleads reasonable reliance.

Third, Defendants note that under Georgia law, a plaintiff may only recover out-of-pocket damages for a negligent misrepresentation claim.  Under this standard,

> The damages recoverable for a negligent misrepresentation are those necessary to compensate the plaintiff for the pecuniary loss to him of which the misrepresentation is a legal cause, including (a) The difference between the value of what he has received in the transaction and its purchase price or other value given for it; and (b) Pecuniary loss suffered otherwise as a consequence of the plaintiff's reliance upon the representation.

BDO Seidman, LLP v. Mindis Acquisition Corp., 578 S.E.2d 400, 401 (Ga.

2003).  Defendants argue that "uncollected premiums" or "increased risk" on

the insurance contract are not out-of-pocket losses.  These arguments mirror

those Defendants made about RICO damages.  Plaintiff points out that the

unpaid premiums represent the contract price for providing workers'

compensation insurance coverage.  (Pl.'s Resp., Dkt. [34] at 15.)  In other

words, Plaintiff seeks pecuniary loss suffered as a consequence of its reliance

on Defendants' representations.  <u>BDO Seidman</u>, 578 S.E.2d at 401.  Thus,

Plaintiff pleads damages recoverable for negligent misrepresentation.

Finally, Defendants Conner and Horner Services contend that they cannot

be liable for negligent misrepresentation because they did not provide the

certificates to Plaintiff; Merciers did.  (<u>See</u> Conner & Horner Services' Br., Dkt.

[31-1] at 17.)  They argue that they were not aware that Chesapeake would

receive or rely on the certificates.  However, Plaintiff pleads in its First

Amended Complaint that the certificates were issued to Conner and Horner

Services, and around December 18, 2012, Conner provided five certificates of

insurance to Merciers.  (First Am. Compl., Dkt. [27] ¶¶ 18-19.)  Because

Plaintiff further pleads that when they supplied Merciers with the certificates,

Defendants intended Chesapeake to charge lower premiums to Merciers, the

Court infers that Conner and Horner Services provided the certificates to

Chesapeake because Chesapeake was a foreseeable recipient of them.

Therefore, Plaintiff states a claim for negligent misrepresentation.

## VI.    Fraud

Plaintiff alleges that Defendants committed fraud with respect to the

October 2010 and June 2011 Certificates.  The tort of fraud requires: "(1) a

false representation or omission of material fact; (2) scienter; (3) intention to

induce the party claiming fraud to act or refrain from acting; (4) justifiable

reliance; and (5) damages."  Lehman v. Keller, 677 S.E.2d 415, 417-18 (Ga. Ct.

App. 2009) (quoting Meyer v. Waite, 606 S.E.2d 16, 20 (Ga. Ct. App. 2004)).

Allegations of fraud must meet the heightened pleading standards of Federal

Rule of Civil Procedure 9(b), which requires a plaintiff to set forth the precise

statements made, who made the statements, when and where the statements

were made, the content of the statements and how they misled the plaintiff, and

how the defendant benefitted from the alleged fraud.  Brooks v. Blue Cross &

Blue Shield of Fla., Inc., 116 F.3d 1364, 1371 (11th Cir. 1997).

Defendants raise three arguments against Plaintiff's fraud claim: (1) the

October 2010 and June 2011 Certificates did not contain any representations

35

about the scope of Horner Services' workers' compensation coverage; (2) Plaintiff did not justifiably rely on these certificates; and (3) Plaintiff did not incur any losses proximately caused by Defendants.  (See Eades' Br., Dkt. [29-1] at 19-21.)  As discussed above, these arguments are without merit. Therefore, Plaintiff states a claim for fraud.

## VII.  Tortious Interference with Contractual Relations

Plaintiff's tortious interference with contractual relations claim rests on its theory that "Defendants IOA, Eades, and Conner induced Horner Services to breach its contract with Merciers," causing financial injury to Chesapeake. (First Am. Compl., Dkt. [27] ¶¶ 52-53.)  Under Georgia law, "[t]ortious interference claims, whether asserting interference with contractual relations, business relations, or potential business relations, share certain common essential elements[:]"

> (1) improper action or wrongful conduct by the defendant without privilege; (2) the defendant acted purposely and with malice with the intent to injure; (3) the defendant induced a breach of contractual obligations or caused a party or third parties to discontinue or fail to enter into an anticipated business relationship with the plaintiff; and (4) the defendant's tortious conduct proximately caused damage to the plaintiff.

Fortson v. Brown, 690 S.E.2d 239, 241 (Ga. Ct. App. 2010) (citation omitted).

36

"The first element's requirement that the tortfeasor acted 'without privilege' requires proof that the defendant was an intermeddler or 'stranger' to the business relationship at issue." ASC Constr. Equip. USA, Inc. v. City Commercial Real Estate, Inc., 693 S.E.2d 559, 564 (Ga. Ct. App. 2010) (citation omitted).  Although it is not necessary to show a breach of contract, when a plaintiff claims that a defendant is liable for making the performance of a contract more difficult, a plaintiff "still must prove that the defendant directly induced adverse behavior by the third party with respect to the third party's contract with the claimant." Great Sw. Express Co., Inc. v. Great Am. Ins. Co. of N.Y., 665 S.E.2d 878, 880 (Ga. Ct. App. 2008) (quoting Sandifer v. Long Investors, Inc., 440 S.E.2d 479, 482-83 (Ga. Ct. App. 1994)).

Defendants focus on the contract between Merciers and Horner Services, arguing that Plaintiff cannot bring a claim for interference with contractual relations because Plaintiff was not a party to that contract, Horner Services was not a stranger to its own contract with Merciers, and Plaintiff does not allege that IOA induced Merciers to breach its contract with Plaintiff.  On the other hand, Plaintiff notes that it does allege Defendants intentionally interfered with *Plaintiff's* contract with Merciers.  Indeed, although Plaintiff first pleads that

37

"Eades, IOA, and Conner induced Horner Services to breach its contract with Merciers," it then states that the these actions "caused Chesapeake's performance of its contract with Merciers to become more expensive and burdensome." (First Am. Compl., Dkt. [27] ¶ 52.) A plaintiff can bring a claim for tortious interference "if the invasion retards performance of the duties under the contract or makes the performance more difficult or expensive." Artrac Corp. v. Austin Kelley Adver., Inc., 399 S.E.2d 529, 532 (Ga. Ct. App. 1990). Thus, Plaintiff pleads facts showing that Defendants, as strangers to the Chesapeake–Merciers contract, acted without privilege by issuing false insurance certificates to Merciers and that these actions induced Merciers to share those certificates with Plaintiff. In this way, Defendants interfered with the Chesapeake–Merciers insurance contract. Plaintiff thus states a claim for tortious interference with contractual relations.

## VIII. Conner's Liability

Defendant Conner argues that he is not liable for Plaintiff's tort claims against him because Horner Services' LLC status shields him from liability. Generally, "a member of a limited liability company . . . is considered separate from the company and is not a proper party to a proceeding by or against a

AO 72A
(Rev.8/82)

limited liability company, solely by reason of being a member of the limited liability company." Sun Nurseries, Inc. v. Lake Erma, LLC, 730 S.E.2d 556, 563 (Ga. Ct. App. 2012) (quoting Milk v. Total Pay & HR Solutions, 634 S.E.2d 208, 211 (Ga. Ct. App. 2006)).  However, a member of an LLC may be held individually liable "if he or she personally participates or cooperates in a tort committed by the LLC or directs it to be done." Id. (quoting Milk, 634 S.E.2d at 213).  Plaintiff alleges that Conner was personally involved in each tort, all of which are based on providing false certificates of insurance to Merciers knowing Chesapeake would rely on them.  Accordingly, Plaintiff alleges a basis for Conner's personal liability.

## IX.    Joint Enterprise Liability

Plaintiff additionally argues that Defendants formed a joint enterprise by conspiring to defraud Chesapeake and are therefore jointly and severally liable. (See First Am. Compl., Dkt. [27] ¶¶ 153-56.)  Rather than being a separate cause of action, the joint enterprise theory is a basis of liability.  Because Plaintiff has stated a claim as to each Defendant, it is unnecessary to resolve this issue at the motion to dismiss stage.  Therefore, Defendants' motions to dismiss as to joint enterprise liability are **DENIED**.

AO 72A
(Rev.8/82)

## Conclusion

For the foregoing reasons, Defendant IOA's Motion to Dismiss [28] is **GRANTED in part** and **DENIED in part**.  It is **GRANTED** as to Plaintiff's RICO claims under federal and Georgia law against IOA, and it is **DENIED** as to all other claims.  Defendant Eades's Motion to Dismiss [29] is **DENIED** as to all claims.  Finally, Defendant Conner and Horner Services' Motion to Dismiss [31] is **GRANTED in part** and **DENIED in part**.  It is **GRANTED** as to Plaintiff's RICO claims under federal and Georgia law against Horner Services, and it is **DENIED** as to all other claims.

**SO ORDERED**, this _5th_ day of January, 2015.


**RICHARD W. STORY**
United States District Judge

AO 72A
(Rev.8/82)